## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD JANKOWSKI, Derivatively on Behalf of Nominal Defendant BECTON, DICKINSON AND COMPANY,<br><br>        Plaintiff,<br><br>   v.<br><br>VINCENT A. FORLENZA, THOMAS E. POLEN, CHRISTOPHER R. REIDY, CATHERINE M. BURZIK, R. ANDREW ECKERT, CLAIRE M. FRASER, JEFFREY W. HENDERSON, CHRISTOPHER JONES, MARSHALL F. LARSEN, DAVID F. MELCHER, CLAIRE POMEROY, REBECCA W. RIMEL, TIMOTHY M. RING, and BERTRAM L. SCOTT,<br><br>        Defendants,<br><br>   and<br><br>BECTON, DICKINSON AND COMPANY,<br><br>        Nominal Defendant. | Case No.<br><br>**<u>VERIFIED SHAREHOLDER</u>**<br>**<u>DERIVATIVE COMPLAINT</u>** |

Plaintiff Ronald Jankowski ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Becton, Dickinson and Company ("BD" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), insider trading, and Contribution for Violations of Sections 10(b) and 21D of the Exchange Act. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel,

including a review of publicly available information, including filings by BD with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      BD is a medical technology that manufactures and sells medical devices, instrument systems, and reagents.  One of its main products is Alaris, a large volume infusion pump that continuously or intermittently delivers fluids, medications, blood and blood products to adult, pediatric or neonatal patients.

2.      Alaris, like many of the Company's products, is subject to strict regulation by the U.S. Food and Drug Administration ("FDA") as to initial commercialization, quality control systems for continued manufacturing, and the implementation of changes or modifications. Specifically, even if a given change does not itself require regulatory approval, the cumulative impact of discrete software changes over time can require FDA clearance demonstrating that the device is substantially equivalent to a predicate device.

3.      Over several years, BD implemented a series of software changes and upgrades to Alaris in response to bugs and defects, all without FDA approval.  Then, in November 2019, the Company announced that it was making certain "improvements" to Alaris that would simply shift the timing of sales to later in the fiscal year.

4.      However, on February 4, 2020, the Company announced a "voluntary recall" of Alaris devices to address software issues "through an upcoming software release."

5.      Then, on February 6, 2020, BD announced that the "software upgrade" for Alaris would require the Company to seek regulatory approval in a single comprehensive filing that incorporates "all Alaris software enhancements, recall remediation updates and changes made to

the Alaris system over time." The filing would be submitted in the fourth quarter of fiscal 2020, thus pushing Alaris sales beyond the fiscal year. In connection with the voluntary recall, the Company recorded a $59 million charge and stated that it "may record incremental charges in future periods associated with this recall."

6.      On this news, the Company's share price fell $33.74, or 12%, to close at $252.25 per share on February 6, 2020.

7.      In the three-month period between the announcement of the certain "improvements" to Alaris and the eventual disclosure that BD would halt sales until it obtained regulatory approval for those software changes, certain defendants profited from nearly $58 million in sales of BD stock.

8.      These revelations precipitated the filing of a securities class action in this District against BD and certain of its officers, captioned *Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.*, Case No. 2:20-cv-02155-SRC-CLW (the "Securities Class Action").

9.      On May 20, 2020, Plaintiff sent a litigation demand to the Board, demanding that the Board "investigate whether any of Becton's officers and directors committed non-exculpable breaches of fiduciary duties or other violations of applicable law." A true and correct copy of this Demand is attached hereto as Exhibit A.

10.      To date, the Board has not responded to the Demand.

11.      Under New Jersey law, the Board had 90 days to respond to the Demand. The Board's failure to do so despite being required to by New Jersey law, and the Company's increasing risk of liability in the Securities Class Action is not a valid exercise of business judgment.

635970.1                                                3

12.     For these reasons and as set forth in greater detail herein, including the Board's unreasonable delay in investigating these matters, Plaintiff now files this action against the Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by BD and its shareholders.

## II.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934 and contribution for violations of Section 10(b) of the Securities Exchange Act of 1934.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).   This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.     PARTIES

**Plaintiff**

15.     Plaintiff Ronald Jankowski purchased shares of BD stock in 2014 and has continuously owned his BD stock since that date.

**Nominal Defendant**

16.     Nominal Defendant BD is a New Jersey corporation with its principal executive offices located at 1 Becton Drive, Franklin Lakes, New Jersey 07417.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "BDX."

**Defendants**

17.     Defendant Vincent A. Forlenza ("Forlenza") served as the Chief Executive Officer ("CEO") from October 2011 to January 2020.  Since July 2012, he has served as the Chairman of the Board.  He is a defendant in the Securities Class Action.

18.     Defendant Thomas E. Polen ("Polen") has served as the CEO of the Company since January 2020, as President since 2017, and as a director since 2018.  He served as Chief Operating Officer ("COO") of the Company from 2017 to January 2020.  He is a defendant in the Securities Class Action.

19.     Defendant Christopher R. Reidy ("Reidy") has served as the Chief Financial Officer ("CFO") and Chief Administrative Officer ("CAO") of the Company since July 2013. He is a defendant in the Securities Class Action.

20.     Defendant Catherine M. Burzik ("Burzik") has served as a director of the Company since 2013.  She is Chair of the Quality and Regulatory Committee and a member of the Science, Marketing, Innovation and Technology ("SMIT") Committee.

21.     Defendant R. Andrew Eckert ("Ecker") has served as a director of the Company since 2016.  He is a member of the Audit and SMIT Committees.

22.     Defendant Claire M. Fraser ("Fraser") has served as a director of the Company since 2006.  She is Chair of the SMIT Committee and a member of the Quality and Regulatory Committee.

23.     Defendant Jeffrey W. Henderson ("Henderson") has served as a director of the Company since 2018.  He is a member of the Audit Committee.

24.     Defendant Christopher Jones ("Jones") has served as a director of the Company since 2010.  He is a member of the Quality and Regulatory Committee.

25.     Defendant Marshall O. Larsen ("Larsen") has served as a director of the Company since 2007.  He is a member of the Quality and Regulatory Committee.

26.     Defendant David F. Melcher ("Melcher") has served as a director of the Company since 2017.  He is a member of the Audit Committee.

27.     Defendant Claire Pomeroy ("Pomeroy") has served as a director of the Company since 2014.  She is a member of the SMIT and Quality and Regulatory Committees.

28.     Defendant Rebecca W. Rimel ("Rimel") served as a director of the Company since 2012.  She was a member of the Audit and SMIT Committees.

29.     Defendant Timothy M. Ring ("Ring") has served as a director of the Company since 2017.  He is a member of the SMIT and Quality and Regulatory Committees.

30.     Defendant Bertram L. Scott ("Scott") has served as a director of the Company since 2002.  He is Chair of the Audit Committee.

31.     The defendants named in ¶¶ 17-30 are sometimes referred to hereinafter as the "Individual Defendants."

IV.     **DUTIES OF THE INDIVIDUAL DEFENDANTS**

A.     **Fiduciary Duties**

32.     By reason of their positions as officers, directors, and/or fiduciaries of BD and because of their ability to control the business and corporate affairs of BD, at all relevant times, the Individual Defendants owed BD and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage BD in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of BD and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to BD and its shareholders a fiduciary duty to exercise good faith and

diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of BD, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with BD, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

34.     To discharge their duties, the officers and directors of BD were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of BD were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     Quality and Regulatory Committee Charter**

35.     The Quality and Regulatory Committee is responsible for "matters relating to regulatory compliance and the quality and safety of the Company's products and services."  The committee's charter provides that members must review:

- The Company's overall quality strategy and the systems in place to monitor the quality and safety of the Company's products and services at all stages of the product life cycle;

- ***The quality internal audit program and the results of any product quality and quality system assessments by the Company and external regulators, and the Company's response to such assessments;*** and

- Processes and procedures relating to compliance with relevant laws and regulations administered by competent authorities, notified bodies, and ministries of health (e.g., US FDA, NMPA, European Commission)

- Any significant issues, developments or trends presented by changes in the global regulatory environment;

- ***Any significant product quality, safety or regulatory registration or compliance issues that arise.***

36.    The Quality and Regulatory Committee must consult the SMIT Committee regarding the latter's "review of product quality issues."  It must also consult the Audit Committee, "as to issues related to regulatory or quality matters that may pertain to the Audit Committee's responsibility for oversight of the Company's ethics and enterprise compliance program and the Company's enterprise risk management activities."

C.    **Audit Committee Charter**

37.    The Audit Committee is responsible for "the integrity of the financial statements and internal controls," "compliance with the ethical standards adopted by the Company," and "compliance by the Company with legal and regulatory requirements."

38.    Under "Risk Management and Ethics and Compliance Matters," the Audit Committee charter provides that its members must review the "methods and processes used by the Company to comply with applicable laws governing the Company's business practices, including laws regarding . . . regulatory matters, including processes for recall and complaint handling."

D.      **SMIT Committee Charter**

39.     The SMIT Committee is responsible for "innovation, new product development and commercialization, and research and development ('R&D') activities at the Company." This includes "reviewing with management the Company's key programs, systems and practices in order to . . . improve product development," among other things. According to the committee's charter, this review shall include:

- monitoring the Company's progress against program objectives, including revenue, efficiency and product development targets.

- reviewing organizational integration, capabilities and systems in light of program objectives, including without limitation, in the areas of marketing and medical affairs.

- reviewing and providing guidance on potentially disruptive trends, opportunities and risks in technology, medical practices, or external market conditions.

- to the extent requested by the Board or another committee of the Board, reviewing any significant product quality issues relating to any particular product or platform, including cybersecurity.

- Site-based visits, when appropriate, for a hands-on perspective with respect to the above

V.      **SUBSTANTIVE ALLEGATIONS**

A.      **Background**

1.      **Company Overview**

40.     BD is a medical technology company that manufactures and sells medical devices, instrument systems, and reagents. It has three business segments: BD Medical, BD Life Sciences, and BD Interventional. BD Medical is the Company's largest segment, accounting for 52% of BD's total revenue in fiscal 2019.

41.     BD Medical's Medication Management Solutions ("MMS") unit, which focuses primarily on infusion systems and dispensing technologies, includes the Alaris product line. BD

acquired the right to manufacture, market, and distribute Alaris, an infusion pump system and associated technologies, when the Company acquired CareFusion Corp. in 2015.

### 2.  Premarket 510(k) Regulatory Approval

42.    Medical device manufacturers like BD are subject to strict regulation by the FDA pursuant to the Food, Drug, and Cosmetic Act (the "FDCA"), as amended by the Medical Device Amendments of 1976 (the "MDA").  The Alaris product line is categorized as a "Class II" device under the MDA, meaning it poses a potential for dangerousness and thus "general controls by themselves are insufficient to provide reasonable assurance of the safety and effectiveness."  21 U.S.C. § 360c(a)(1)(B).

43.    Class II devices must be approved for distribution and monitored for device changes through the FDA's Premarket Notification 510(k) program.  Specifically, a manufacturer must seek regulatory approval to manufacture and market a device when first introducing it into commercial distribution and thereafter when there is a change or modification that could significantly affect the safety or effectiveness of the device.  Guidance issued by the FDA makes clear that even if a given change does not itself require 510(k) clearance, the cumulative impact of discrete software changes over time can require new 510(k) clearance to demonstrate that the device is substantially equivalent to a predicate device.

### 3.  The Amended Consent Decree

44.    When BD acquired Alaris, the product was subject to an amended consent decree by the FDA following several quality control issues and product recalls.

45.    In August 2006, Cardinal Health, which manufactured Alaris at the time, recalled numerous Alaris models due to the potential for over-infusion caused by a software issue with the keypad.  Letters and warning labels were sent to customers of approximately 140,000 pumps. That same month, the U.S. Attorney for the Southern District of California filed a forfeiture

complaint, alleging that the pump quality was substandard and that the FDA's inspection of the Alaris manufacturing facility had uncovered multiple violations of current good manufacturing practices ("cGMP") and quality systems regulations.  Cardinal Health suspended production, sales, and repairs of the Alaris SE pump after nearly 1,300 pumps were seized by the FDA.

46.     To resolve the allegations, Cardinal Health entered into a consent decree with the FDA on February 7, 2007 (the "Consent Decree"), which detailed the processes that Cardinal Health had to follow to resume manufacturing and sales of Alaris SE pumps.  However, in June 2007, Alaris pumps were recalled for manufacturing defects and sterilization issues, and in October 2007, almost 200,000 Alaris pumps were recalled because they were at risk for inaccurate flow rates caused by assembly and manufacturing defects.

47.     Following an inspection in early 2008, the FDA issued a Form 483 dated February 1, 2008 to Cardinal Health outlining violations of cGMP and quality systems regulations.  Thereafter, the Consent Decree was amended in February 2009 to include all Alaris infusion pumps then produced (the "Amended Consent Decree").  On April 24, 2009, Cardinal Health submitted a corrective action plan, as required by the Amended Consent Decree, to the FDA and disclosed that there was a software problem with the Alaris PCA module and Alaris PC Unit operating with software versions 8 through 9.1.  Though Cardinal Health proposed a software correction, it required clearance under the FDA's Premarket notification 510(k) program.  Cardinal Health obtained the required 510(k) clearance in July 2009 and resumed shipping units.  That same year, Cardinal Health spun off CareFusion, which manufactured Alaris, as a public company until it was acquired by BD in 2015.

48.     At all relevant times, BD remained subject to the Amended Consent Decree.  If the Company was found to violate the Amended Consent Decree, the FDA could order BD to cease the manufacture and distribution of products, recall products, or take other actions.

**B.      The Individual Defendants Cause the Company to Issue Misleading Statements**

49.     On November 5, 2019, the Individual Defendants caused the Company to issue a press release announcing BD's fourth quarter and full year 2019[1] financial results, as well as fiscal 2020 guidance.  Therein, BD stated, in relevant part:

> - The company expects full fiscal year 2020 revenues to increase 4.0 to 4.5 percent as reported, or 5.0 to 5.5 percent on a currency-neutral basis.
>
> - As adjusted, the company expects full fiscal year 2020 diluted earnings per share to be between $12.50 and $12.65, resulting in growth of approximately 9.5 to 11.0 percent on a currency-neutral basis.

50.     The same day, the Company held a conference call to discuss the results and guidance with investors and analysts.  During the call, defendant Forlenza stated:

> *[Y]ou will see our initial guidance for fiscal year 2020, which reflects continued momentum across our businesses and strong revenue growth of 5% to 5.5%. On the bottom line, we expect to deliver adjusted EPS between $12.50 and $12.65.* This represents currency-neutral growth of 9.5% to 11% that is driven by strong underlying growth that is breaching high teens. *All in all, we expect to drive earnings growth of about 7% to 8.5%.* Our outlook is based on our current view of the environment.

51.     Defendant Reidy similarly stated: "We expect currency-neutral revenue growth of 5% to 5.5% on a comparable basis."  He also stated: "By segment, for the full year, we expect BD Medical revenues to grow between 4% and 5%."

---

[1] The Company's fiscal year begins on October 1 and ends September 30 of the following calendar year.

52.     Though defendant Reidy acknowledged certain "improvements" to Alaris that were in development, he claimed that these "upgrades" would simply shift the timing of certain sales. Specifically, he stated:

> From a phasing perspective, we expect revenue growth in the first half of the fiscal year to be approximately 100 basis points below the full year guidance range driven by first quarter revenue growth of 1% to 2%. In our MMS business, we are planning to make some improvements to our Alaris pump software, including upgrades to alarm prioritization and optimization. ***We are in discussions with the FDA about the timing of implementation of these upgrades and the possibility of bundling them with a new software version release. This is expected to move the timing of some sales from Q1 to the balance of the fiscal year.***

53.     When an analyst asked for further detail on the impact of these Alaris changes to revenue, defendant Reidy responded that "revenue growth [is expected] to be between 1% and 2%, and ***one of the drivers of that is the timing of the upgrades on the Alaris pump software.***" He continued that despite this "1% to 2% growth in the first quarter, [management] expect[s] the first half to be relatively close to guidance of within 100 basis points."

54.     To quell analysts' concerns about the impact of the software rollout, defendant Polen touted Alaris as the "clear leader and product choice," stating:

> So just a note. As you know, Alaris is the clear leader and product choice in, not only the infusion market, but also as part of a broader Medication Management Solution that our customers are investing in. ***And it's part of our process and our strategy in the business to continually iterate and make enhancements to the platform.*** And so you've seen us do that certainly on the hardware side with significant investments, such as the new Alaris M2 pump launch, which has been extremely well received by our customers. ***And we've been making those same type of investments in software upgrades over the last couple of years. And this upgrade right here is a continued reflection on those investments and will be forthcoming.***
>
> I would just say in terms of momentum, maybe just one other comment there on your question, we saw in FY '19 near or at, I'd say, record levels of continued share gain both in the infusion and the dispensing business, so about 200 basis points of gain in infusion and 100 in dispensing. ***And we see no slowdown in that momentum.***

55.     The above statements in ¶¶ 48-53 were materially misleading because they failed to disclose: (1) that BD marketed Alaris products with software changes that had not been approved by the FDA; (2) that Alaris suffered numerous software defects that posed significant safety issues; (3) that BD's quality systems and controls with respect to Alaris did not comply with FDA requirements; (4) that, as a result, BD was not in compliance with the Amended Consent Decree; (5) that, as a result of the foregoing, Alaris shipments had been put on hold after an audit by the FDA; and (6) that, as a result of the foregoing, the Company's fiscal 2020 guidance was materially misleading.

56.     On November 27, 2019, defendants Forlenza, Reidy, Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott signed and caused BD to file its Form 10-K with the SEC for the period ended September 30, 2019 (the "2019 10-K"). Therein, the Company stated, regarding compliance with FDA regulations:

> ***Our failure to comply with the applicable good manufacturing practices, adverse event reporting, and other requirements of these agencies could delay or prevent the production, marketing or sale of our products and result in fines, delays or suspensions of regulatory clearances, warning letters or consent decrees, closure of manufacturing sites, import bans, seizures or recalls of products and damage to our reputation.*** More stringent oversight by the FDA and other agencies in recent years has resulted in increased enforcement activity, which increases our compliance risk.

57.     Specifically, as to the Amended Consent Decree, the 2019 10-K stated, in relevant part:

> ***While this BD organizational unit remains subject to the amended consent decree, which includes the requirements of the original consent decree, it has made substantial progress in its compliance efforts.*** However, we cannot predict the outcome of this matter, and the amended consent decree authorizes the FDA, in the event of any violations in the future, to order us to cease manufacturing and distributing infusion pumps, recall products and take other actions. . . .
>
> We also cannot currently predict whether additional monetary investment will be incurred to resolve this matter or the matter's ultimate impact on our business. We may be obligated to pay more costs in the future because, among other things, ***the***

***FDA may determine that we are not fully compliant with the amended consent decree*** and therefore impose penalties under the amended consent decree, and/or we may be subject to future proceedings and litigation relating to the matters addressed in the amended consent decree. ***As of September 30, 2019, we do not believe that a loss is probable in connection with the amended consent decree,*** and accordingly, we have no accruals associated with compliance with the amended consent decree.

*       *       *

As a result of the CareFusion acquisition, we are operating under a consent decree with the FDA relating to our U.S. infusion pump business. ***The consent decree authorizes the FDA, in the event of any violations in the future, to order us to cease manufacturing and distributing products, recall products or take other actions, and we may be required to pay significant monetary damages if we fail to comply with any provision of the consent decree.***

58.     Regarding quality controls, the 2019 10-K stated, in relevant part:

***BD actively maintains FDA/ISO Quality Systems that establish standards for its product design, manufacturing, and distribution processes. Prior to marketing or selling most of its products, BD must secure approval from the FDA and counterpart non-U.S. regulatory agencies.*** Following the introduction of a product, these agencies engage in periodic reviews and inspections of BD's quality systems, as well as product performance and advertising and promotional materials. These regulatory controls, as well as any changes in FDA policies, can affect the time and cost associated with the development, introduction and continued availability of new products. ***Where possible, BD anticipates these factors in its product development and planning processes. These agencies possess the authority to take various administrative and legal actions against BD, such as product recalls, product seizures and other civil and criminal sanctions.*** BD also undertakes voluntary compliance actions, such as voluntary recalls.

59.     The above statements in ¶¶ 55-57 were materially misleading because they failed to disclose: (1) that BD marketed Alaris products with software changes that had not been approved by the FDA; (2) that Alaris suffered numerous software defects that posed significant safety issues; (3) that BD's quality systems and controls with respect to Alaris did not comply with FDA requirements; (4) that, as a result, BD was not in compliance with the Amended Consent Decree; (5) that, as a result of the foregoing, Alaris shipments had been put on hold after

an audit by the FDA; and (6) that, as a result of the foregoing, the Company's fiscal 2020 guidance was materially misleading.

### C.      The Truth Begins to Emerge

60.      On February 4, 2020, the Individual Defendants caused BD to announce a "voluntary recall" to address software issues with Alaris.  The notification, posted on the Company's website, stated: "BD intends to address the issues through an upcoming software release. BD will update the software for affected devices at no charge and will contact affected customers to initiate the scheduling process for the software update when the software becomes available."

61.      On February 6, 2020, BD lowered its full year 2020 revenue guidance because the "software upgrade" for Alaris would "require additional regulatory findings beyond what the company previously anticipated."  Specifically, in a press release, the Company stated:

> [BD] is continuing to work with the U.S. Federal Drug Administration (FDA) on its software remediation plan for the Alaris System, which will require additional regulatory filings beyond what the company previously anticipated. ***The company expects to submit its comprehensive regulatory filing in the fourth quarter of fiscal year 2020.*** In the interim, the company will partner with the FDA ***and existing customers to ensure continued access to the Alaris System under medical necessity***. As a result, the company is lowering its full fiscal year revenue and adjusted diluted earnings per share guidance.
>
> *       *       *
>
> <u>**Fiscal 2020 Outlook for Full Year**</u>
>
> The company is lowering its full fiscal year 2020 revenue and adjusted diluted earnings per share guidance ***to reflect the impact of the remediation effort and anticipated loss of sales of the Alaris infusion system.***
>
> The company now expects full fiscal year 2020 revenues to increase 1.5 to 2.5 percent as reported, or 2.5 to 3.5 percent on a currency-neutral basis.
>
> The company now expects full fiscal year 2020 adjusted diluted earnings per share to be between $11.90 and $12.10.

62.     During a conference call held the same day, defendant Polen explained that the Company was required to seek regulatory approval for the software enhancements, including ones that had already been made "over time":

> In November, we told you we were planning to make some improvements to our Alaris pump software, including upgrades to alarm prioritization and optimization. We indicated then that we were in active discussions with the FDA about the timing and implementation of these improvements. Relying on our quality process within the Infusion business and how we've managed Alaris software updates over time, the team believed we could take a phased approach to releasing Alaris software updates and that these releases did not require a 510(k) clearance. We then issued the first phase of our software updates in December, and we resumed shipping, as we shared with you last month.
>
> Through our ongoing dialogue with the FDA, including in-depth discussion this past Monday, we learned that the FDA disagreed with our conclusion about the need for a new 510(k) clearance for these software upgrades. *And in light of the consent decree, the FDA has requested that we combine all Alaris software enhancements, recall remediation updates and changes made to the Alaris system over time into a single comprehensive 510(k) filing, which we're going to submit in the fourth quarter of FY '20.* We're actively continuing to collaborate with the FDA to ensure we meet their expectations for this upcoming regulatory submission.
>
> I want to be clear here that while we relied on our infusion quality process and system, we have now learned that in this case, it did not meet FDA's expectations, and we're committed to taking the appropriate actions to get this right.

63.     When an analyst asked for clarification about what changes were needed regarding BD's quality controls, defendant Polen admitted that the Company had implemented upgrades to Alaris for *years* without seeking regulatory approval, contrary to applicable regulations:

> So as I mentioned, based on the quality system in our Infusion business, we've made software upgrades over time to the Alaris system. And over that period of time, we're talking -- not this year, *we're talking a number of years, our quality process determined that those upgrades that we've been making in that business did not require a 510(k) clearance. And so most recently, on the most recent changes and updates that we made, we followed that same process.* And our team determined based on that process that those recent updates in November also did not require a new 510(k) clearance. And so we released that software

improvement in December, and we resumed shipping, as we had shared with you last month.

Since what we've learned, and as I mentioned, we had a key meeting with the FDA as recently as this Monday, through our ongoing dialogue with the FDA, we learned that *the FDA disagreed with that determination about the need for a new 510(k) clearance for the updated software. And that applies not just to the upgraded software that we're talking about in November, but that decision process that had occurred over time.* And so as I said, we're collaborating with the FDA on their request to combine all the Alaris software enhancements and remediation upgrades with the additional changes made to the Alaris system over time, right, over years, into a more comprehensive regulatory filing, which is going to be submitted this summer. And so while you're right, we are ready to -- we have the information ready for the recent software upgrades, we are -- *the work that has to take place between now and the submission date is more in reference to the historical changes that have been made over multiple years going back, and the -- some additional testing that we need to do on those historic changes to reflect the testing requirements today.* So that's the work that has to be done.

64.     But analysts "struggl[ed] to understand . . . how [management] got caught offguard and how this went from sort of a software upgrade to something much more significant." Defendant Polen attempted to explain:

[I]t's not unprecedented where there are situations where over time a product evolves. And then the FDA looks and says, wait a minute, your current 510(k) needs to be updated to reflect those series of changes over time. And in this case, we had a -- *there is a process in the business, and there's a specific quality process within the Infusion business within the consent decree that the team was following that said each of those individual changes didn't require a 510(k) process.* Again, when the FDA looks back at it over a 5-, 10-year period, they say, wait a minute, you actually need to put in a 510(k) given that series of changes that have been made. And that's the exact work that we're doing.

65.     In its quarterly report on Form 10-Q for the period ended December 31, 2019, which was also filed with the SEC on February 6, 2020, the Company disclosed a $59 million charge related to the recall of Alaris pumps:

On February 4, 2020, *the Company initiated a voluntary recall of certain Alaris$^{TM}$ pump systems in order to address software errors and other alarm prioritization matters.* The estimated cost of this recall of $59 million was recorded to *Cost of products sold* during the three months ended December 31,

2019. The Company may record incremental charges in future periods associated with this recall.

\* \* \*

First quarter Medical segment revenues were unfavorably impacted by the Medication Management Solutions unit's delay of shipments of Alaris™ infusion pumps pending compliance with certain regulatory filing requirements of the U.S. Food and Drug Administration ("FDA"). ***Currently, BD will only sell pumps to existing customers who demonstrate a medical necessity for the pumps***. As a result, we expect revenues from our Medication Management Solutions unit for the current fiscal year to decline significantly compared to the prior year. We expect the filing with the FDA to be made in BD's fourth fiscal quarter.

66.    On this news, the Company's share price fell $33.74, or 12%, to close at $252.25 per share on February 6, 2020.

67.    On March 6, 2020, the FDA categorized BD's "voluntary" recall with a Class I recall designation, which refers to situations where use of the device could cause serious injuries or death.  The recall impacted over 750,000 devices.

### D.    The Director Defendants Issued a Materially Misleading Proxy Statement to Solicit Stockholder Votes

68.    On December 16, 2019, defendants Forlenza, Polen, Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held January 28, 2020.  In the proxy statement, these thirteen defendants solicited stockholder votes in favor of five management proposals, including: (i) a proposal to elect Forlenza, Polen, Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott to new terms as directors; and (ii) a proposal to approve an amendment to the 2004 Employee and Director Equity-Based Compensation Plan (the "2004 Plan").

69.    The proxy statement disclosed that the Board had determined that defendants Forlenza and Polen are not independent.

70.     Regarding corporate governance and risk oversight, the proxy statement stated:

BD's management engages in a process referred to as enterprise risk management ("ERM") to identify, assess, manage and mitigate a broad range of risks across BD's businesses, regions and functions, and to ensure alignment of our risk assessment and mitigation efforts with BD's corporate strategy. The Audit Committee, through the authority delegated to it by the Board, is primarily responsible for overseeing BD's ERM activities. At least twice a year, senior management reviews the results of its ERM activities with the Audit Committee, including the process used within the organization to identify risks, management's assessment of the significant categories of risk faced by BD (including any changes in such assessment since the last review), and management's plans to mitigate potential exposures. The significant risks identified through BD's ERM activities and the related mitigation plans are also reviewed with the full Board at least once a year. In addition, particular risks are often reviewed in-depth with the Audit Committee or the full Board.

The full Board also reviews the risks associated with BD's strategic plan and discusses the appropriate levels of risk in light of BD's business objectives. This is done through an annual strategy review process, and from time-to-time throughout the year as part of the Board's ongoing review of corporate strategy. The full Board also regularly oversees other areas of potential risk, including BD's capital structure, acquisitions and divestitures, and succession planning for BD's CEO and other members of senior management.

The various Committees of the Board are also responsible for monitoring and reporting to the full Board on risks associated with their respective areas of oversight. The Audit Committee, among other things, oversees BD's accounting and financial reporting processes and the integrity of BD's financial statements, BD's ethics and compliance program, and its hedging activities and insurance coverages. The QRC oversees matters relating to regulatory compliance and the quality and safety of BD's products and services.

71.     Regarding non-employee director compensation, the proxy statement provided that Larsen received $168,904 in fees for his service on the Board during 2019; Fraser and Scott received $130,452 each; Burzik received $128,904; Jones received $24,260; and Eckert, Henderson, Melcher, Pomeroy, Rimel, and Ring received $107,000 each.  In addition to this excessive compensation, the 2004 Plan authorizes the issuance of shares of the Company's common stock for equity awards to BD's employees and directors.  As of September 30, 2019, 5,574,749 shares were available for future grant.

72.     Equity pursuant to the 2004 Plan is effectively awarded at the discretion of the Board:

> The 2004 Plan is administered by the Compensation Committee. The Compensation Committee has the sole discretion to grant to eligible participants one or more equity awards and to determine the type, number or amount of any award to be granted. The Compensation Committee has the authority to, among other things, interpret any provision of the 2004 Plan, adopt rules and regulations for administering the 2004 Plan, and delegate any administrative responsibilities under the 2004 Plan. Decisions of the Compensation Committee are final and binding on all parties.

73.     The proxy statement solicited shareholder approval of an amendment to the 2004 Plan to increase the number of shares of common stock reserved for issuance thereunder by 6.2 million shares.  If approved, the total number of shares reserved for issuance would be 46 million, which represents approximately 17% of the Company's common stock outstanding as of December 9, 2019.

74.     The proxy statement was materially misleading for the following reasons: (i) it misrepresented the Board's activities with respect to risk management wile soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.  A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

75.     On January 31, 2020, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2019 proxy statement.  In particular: (i) Forlenza, Polen, Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott were reelected to new terms as directors; and (ii) the amendment to the 2004 Plan was approved by stockholders.  The reelection of these thirteen directors and approval of the amendment to the 2004 Plan based on the misleading statements contained in the 2019 proxy

statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of them at the expense of the Company's unaffiliated stockholders.

      **E.**     **Defendants Forlenza and Polen Sold Over $58 Million in BD Stock While in Possession of Material Non-Public Information**

<u>Forlenza</u>

76.    Defendant Forlenza was the Company's Chief Executive Officer with a highly sophisticated understanding of the Company's results and their import.

77.    As set forth herein, defendant Forlenza possessed material negative information which he knew was being concealed from investors.  Defendant Forlenza consciously acted to exploit his knowledge by selling nearly $54 million of BD stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/12/19 | 4,717 | $265.57 | $1,252,693 |
| 12/12/19 | 11,626 | $265.57 | $3,087,516 |
| 1/2/20 | 33,365 | $271.28 | $9,051,257 |
| 1/2/20 | 12,083 | $271.28 | $3,277,876 |
| 1/8/20 | 13,860 | $275.19 | $3,814,133 |
| 1/8/20 | 4,923 | $275.19 | $1,354,760 |
| 1/10/20 | 19,675 | $275.15 | $5,413,576 |
| 1/10/20 | 6,990 | $275.15 | $1,923,298 |
| 1/23/20 | 6,284 | $280.06 | $1,759,897 |
| 1/23/20 | 2,180 | $280.06 | $610,530 |
| 1/24/20 | 7,177 | $280.13 | $2,010,493 |
| 1/24/20 | 2,489 | $280.13 | $697,243 |
| 1/27/20 | 25,546 | $280.09 | $7,155,179 |
| 1/27/20 | 8,860 | $280.09 | $2,481,597 |
| 1/28/20 | 9,848 | $280.96 | $2,766,894 |
| 1/28/20 | 28,514 | $280.96 | $8,011,293 |
| **Total** | **198,137** | | **$54,668,240** |

78. Defendant Forlenza thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Polen

79. Defendant Polen was the Chief Operating Officer with a highly sophisticated understanding of the Company's results and their import.

80. As set forth herein, defendant Polen possessed material negative information which he knew was being concealed from investors. Defendant Polen consciously acted to exploit his knowledge by selling over $3.7 million of BD stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/16/19 | 1,953 | $269.63 | $526,587 |
| 12/16/19 | 5,568 | $269.63 | $1,501,299 |
| 12/16/19 | 1,954 | $269.63 | $526,857 |
| 12/16/19 | 4,432 | $269.63 | $1,195,000 |
| **Total** | **13,907** | | **$3,749,744** |

81. Defendant Polen thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

## VI.    DAMAGES TO THE COMPANY

82. As a direct and proximate result of the Individual Defendants' conduct, BD has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)    Costs associated with the software upgrade, including regulatory approval;

b)    Legal fees incurred in connection with the Securities Class Action;

c)    Any funds paid to settle the Securities Class Action; and

        d)      Costs incurred from compensation and benefits paid to the defendants who have breached their duties to BD.

83.      In addition, BD's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

84.      The actions complained of herein have irreparably damaged BD's corporate image and goodwill.  For at least the foreseeable future, BD will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that BD's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND ALLEGATIONS

85.      Plaintiff brings this action derivatively in the right and for the benefit of BD to redress injuries suffered, and to be suffered, by BD as a direct result of breaches of fiduciary duty by the Individual Defendants, violations of Section 14(a) of the Exchange Act, insider trading, and Contribution for Violations of Sections 10(b) and 21D of the Exchange Act.  BD is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

86.      Plaintiff will adequately and fairly represent the interests of BD in enforcing and prosecuting its rights.

87.      Plaintiff has continuously been a shareholder of BD at times relevant to the wrongdoing complained of and is a current BD shareholder.

88.     When this action was filed, BD's Board of Directors consisted of defendants Forlenza, Polen, Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott.

89.     Plaintiff made a demand on the Board to investigate and remedy the violations of law described herein as required by New Jersey law.  As detailed below, the Board failed to respond to the demand during the time allotted under New Jersey law, and apparently therefore has not evaluated its merits in good faith based on all information reasonably available to it. And, as alleged below, the Board did not in fact act independently in its review of the Demand. The Board's conduct upon receipt of the Demand and thereafter demonstrates not only that the Board did not fully inform itself during its consideration of the Demand, but also that the Board never considered the Demand in good faith, and rejected it for reasons unrelated to the merits of the claims and BD's best interests.  Accordingly, the Board's refusal of the Demand is not a protected exercise of business judgment.

90.     On May 20, 2020, Plaintiff sent the Demand to the Board. The Demand states that Plaintiff has owned shares of BD since 2014.  The Demand alleges that, as detailed above, BD failed to disclose that: (1) the Alaris pump suffered software errors and alarm prioritization issues; (2) the Company was developing remedial solutions to these issues, not to "make enhancements" as Becton had claimed; (3) due in part to the consent decree, these remedial efforts could be delayed to ensure regulatory compliance; and (4) the foregoing could reasonably likely result in a recall of Becton's Alaris pumps.

91.     The Demand asks the Board to "investigate whether any of Becton's officers and directors committed non-exculpable breaches of fiduciary duties or other violations of applicable law."  A true and correct copy of the Demand is attached hereto as Exhibit A.

92.     Plaintiff received no response to the demand for more than 90 days.

93.     On September 2, 2020, counsel for the Company contacted Plaintiff's counsel and stated that the Board was evaluating the demand.

94.     In an email dated October 14, 2020, counsel for BD stated that a Special Committee had been formed, that the Committee has engaged counsel, and "that the Committee's counsel will be in touch with [Plaintiff's counsel] at the appropriate time."

95.     Under New Jersey law, the Board was required to respond to the Demand within 90 days of receipt.  The Board did not respond in the allotted time, and Plaintiff therefore has standing to sue derivatively.

96.     A majority of the directors who received the Demand were not independent and disinterested.  Burzik, Fraser, Jones, Larsen, Pomeroy, and Ring served as members of the Quality and Regulatory Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's quality system controls for BD's products.  In their capacities as Quality and Regulatory Committee members, Burzik, Fraser, Jones, Larsen, Pomeroy, and Ring were aware of the Alaris software upgrades and the assessment that it was not necessary to seek 510(k) regulatory approval.  As alleged herein, Burzik, Fraser, Jones, Larsen, Pomeroy, and Ring failed to ensure BD's compliance with applicable laws and regulations.  Thus, they would be interested in a demand regarding their own wrongdoing.

97.     In addition, Fraser, Burzik, Eckert, Pomeroy, Rimel, and Ring served as members of the SMIT Committee at all relevant times.  As such, they are responsible for reviewing significant product quality issues, and as alleged herein, failed to implement the Alaris software upgrades in compliance with applicable regulations.  Thus, Fraser, Burzik, Eckert, Pomeroy, Rimel, and Ring would be interested in a demand regarding their own wrongdoing.

98.     Moreover, Scott, Eckert, Henderson, Melcher, and Rimel served as the members of the Audit Committee at relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  In their capacities as Audit Committee members, Scott, Eckert, Henderson, Melcher, and Rimel reviewed and approved the disclosures regarding the Company's financial statements, including with respect to expected revenue from Alaris sales.  As alleged herein, Scott, Eckert, Henderson, Melcher, and Rimel failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in BD's SEC filings and other disclosures.  Thus, Scott, Eckert, Henderson, Melcher, and Rimel would be interested in a  demand regarding their own wrongdoing.

99.     Thus, the Board's failure to act in the face of the foregoing conduct is not a valid exercise of business judgment.  Accordingly, a majority of the Board were aware or recklessly disregarded that BD's representations to investors were materially false and misleading and omitted material information necessary to properly evaluate the Company's financial condition, and therefore could not have independently considered the Demand.

## COUNT I
### Against Defendants Forlenza, Polen, and Reidy for Breach of Fiduciary Duty

100.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.     Defendants Forlenza, Polen, and Reidy each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BD's business and affairs, particularly with respect to issues as fundamental as public disclosures.

102.     The conduct by defendants Forlenza, Polen, and Reidy set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.

Defendants Forlenza, Polen, and Reidy intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of BD.

103.    In breach of their fiduciary duties owed to BD, defendants Forlenza, Polen, and Reidy willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

104.    In particular, defendants Forlenza, Polen, and Reidy knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

105.    As a direct and proximate result of the breaches of their fiduciary obligations by defendants Forlenza, Polen, and Reidy, BD has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.   As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II
### Against Defendants Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott for Breach of Fiduciary Duty

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    Defendants Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BD's business and affairs, particularly with respect to issues as fundamental as public disclosures.

108.    The conduct by defendants Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott set forth herein was due to their intentional or

reckless breach of the fiduciary duties they owed to the Company.  Defendants Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of BD.

109.    In breach of their fiduciary duties owed to BD, defendants Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

110.    In particular, defendants Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

111.    As a direct and proximate result of the breaches of their fiduciary obligations by defendants Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott, BD has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## <u>COUNT III</u>
**(Against Forlenza, Polen, and Reidy for Contribution**
**For Violations of Sections 10(b) and 21D of the Exchange Act)**

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    Defendants Forlenza, Polen, and Reidy are named as defendants in the related Securities Class Action. The conduct of these Defendants, as described herein, has exposed the

Company to significant liability under various federal and state securities laws by their disloyal acts.

114.    BD is named as a defendant in related securities class actions that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If BD is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

115.    As officers, directors and otherwise, Defendants Forlenza, Polen, and Reidy had the power or ability to, and did, control or influence, either directly or indirectly, BD's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

116.    Defendants Forlenza, Polen, and Reidy are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

117.    Defendants Forlenza, Polen, and Reidy have damaged the Company and are liable to the Company for contribution.

118.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT IV

### Against Forlenza and Polen for Insider Selling

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    As alleged above, Forlenza and Polen are fiduciaries of BD, possessed material, non-public information of BD, and used that information improperly to profit from sales of BD stock.  When Forlenza and Polen directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

121.    When Forlenza and Polen sold their BD stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of BD stock would be significantly lower.  Forlenza and Polen timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold.  They thereby benefitted by misappropriating BD's non-public information.

122.    Plaintiff has no adequate remedy at law.

## COUNT V

### Against Defendants Forlenza, Polen, Burzik, Eckert, Fraser, Henderson, Jones, Larsen, Melcher, Pomeroy, Rimel, Ring, and Scott for Violations of Section 14 of the Securities Exchange Act of 1934

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. §240.14a-9.   Specifically, the Company's proxy statement filed on December 16, 2019 violated §14(a) and Rule 14a-9 because: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.

125.    In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

126.    The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement.  The 2019 proxy statement solicited shareholder votes for: (i) director nominees; (ii) ratification of the appointment of the Company's independent auditor; (iii) executive compensation; (iv) approval of the amendment to the 2004 Employee and Director Equity-Based Compensation Plan; and (v) approval of the French Amendment to the 2004 Employee and Director Equity-Based Compensation Plan. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

127.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of BD, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of BD and that plaintiff is an adequate representative of the Company;

B.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.      Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to BD;

D.      Directing BD to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BD and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen BD's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of BD to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of BD has an effective remedy;

     F.     Awarding to BD restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

     G.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

     H.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: November 2, 2020

By: s/ *Lisa J. Rodriguez*
**Schnader Harrison Segal & Lewis LLP**
220 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002
Telephone: (856) 482-5741
Email: ljrodriguez@schnader.com

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

*Counsel for Plaintiff Ronald Jankowski*

635970.1